**Edythe L. R. DYER, Plaintiff,**

v.

**EASTERN TRUST AND BANKING COMPANY et al., Defendants.**

**Civ. No. 1872.**

United States District Court, D. Maine, N. D.

Dec. 30, 1971.

894

Louis Rene Marcou, Waterville, Me., Gael Mahony, Joseph D. Steinfield, Joseph D. Hinkle, Boston, Mass., for plaintiff.

Robert J. Hallisey, Francis H. Fox, Joseph F. Hunt, III, Joseph P. Rooney, Peter M. Saparoff, Boston, Mass., Arnold L. Veague, John E. McKay, Bangor, Me., for defendants.

## OPINION AND ORDER
## OF THE COURT

GIGNOUX, District Judge.

This action arises under the Securities Act of 1933 ("the Securities Act"), the Securities Exchange Act of 1934 ("the Exchange Act"), and the Maine Blue Sky Law. Plaintiff Edythe L. R. Dyer is a citizen of the State of Maine, formerly a stockholder of defendant Eastern Trust and Banking Company ("Eastern Trust"), and presently a stockholder of defendant Northeastern Bankshares Association ("the Associa-

tion"). Eastern Trust is a Maine trust company. The Association is a Maine bank holding company. The individual defendants are all citizens of Maine and at times relevant to this litigation were all officers and/or directors of one, or both, of the corporate defendants.

The amended complaint ("the Complaint") contains ten counts, each purporting to state a separate claim. Presently before the Court are defendants' motions for summary judgment; defendants' motions to dismiss, or in the alternative to strike portions of, the Complaint; and defendant McDonald's separate motion to dismiss certain counts of the Complaint in which he is named as a defendant.

## I

### SUMMARY OF THE COMPLAINT

The ten counts of the Complaint are based on two separate but related series of transactions.

#### A. *Transactions in 1968 and 1969.*

Prior to March 18, 1969, plaintiff was the owner of 1,525 shares of stock in Eastern Trust. During the spring and summer of 1968 certain of the individual defendants and Eastern Trust devised a plan whereby the Association would be created as a bank holding company under Maine law to own all the shares of Eastern Trust. The Association was then created by six of the individual defendants.[1] The Association, in turn, established Kenduskeag Banking Company ("Kenduskeag") under the Maine banking laws as a wholly-owned subsidiary. It was never intended that Kenduskeag, which has been variously described as an "interim" or "phantom" bank, would carry on any banking business. Eastern Trust thereafter sent out to plaintiff and the other stockholders of Eastern Trust a proxy statement ("the 1968 Proxy Statement") for a special meeting of stockholders to be held on October 10,

1968, at which the Eastern Trust shareholders would be asked to approve a Plan of Reorganization ("the 1968 Reorganization") whereby (1) Eastern Trust and Kenduskeag would merge, with Eastern Trust the survivor; (2) each shareholder of Eastern Trust who did not dissent would relinquish his shares and receive Association shares; and (3) the Association would own all shares of Eastern Trust and the former shareholders of Eastern Trust would own shares in the Association (in the ratio of four shares of the Association for one share of Eastern Trust). The Plan was approved at the special meeting of the stockholders of Eastern Trust held in October 1968. Thereafter, when the various conditions specified in the Plan (including the obtaining of an opinion from counsel that the distribution of Association shares to the Eastern Trust stockholders was exempt from the registration requirements of Section 5 of the Securities Act, a "no-action" letter from the Securities and Exchange Commission, and a favorable tax ruling from the Internal Revenue Service) had been satisfied, the Plan was declared effective on March 18, 1969, and plaintiff, along with the other stockholders of Eastern Trust who did not exercise their cash appraisal rights, became a stockholder of the Association, and the Association became the owner of all the stock of Eastern Trust.

#### B. *Transactions in 1970.*

The second series of transactions upon which the Complaint is based occurred in 1970 and involved the acquisition by the Association of all the shares of stock in three more banks: First-Manufacturers National Bank of Lewiston, Maine ("First Bank"), The Peoples National Bank of Farmington, Maine ("Peoples Bank") and Westbrook Trust Company of Westbrook, Maine ("Westbrook Trust"). These acquisitions ("the 1970 Acquisitions") were carried out by

[1]. The Association was originally organized under the name of Eastern Trust Financial Associates. The name was changed to Northeastern Bankshares Association in June 1969.

means of an exchange offer made by the Association, in which it offered to the stockholders of the banks to be acquired stock of the Association at designated ratios in exchange for stock of the other banks. The stock issued in the exchange by the Association was registered pursuant to the Securities Act, and a statutory prospectus ("the 1970 Prospectus") was delivered to all the stockholders of the banks to be acquired. The 1970 annual meeting of the Association was held on March 16, 1970. Prior to the meeting, the Association sent out to plaintiff and the other stockholders of the Association a proxy statement for the meeting ("the 1970 Proxy Statement"), together with a copy of the 1970 Prospectus. The 1970 Proxy Statement solicited the proxies of the stockholders of the Association to vote for the re-election of certain directors on the understanding that these directors, if elected, would effectuate the 1970 Acquisitions. In addition, the 1970 Proxy Statement solicited proxies to vote for the election of additional directors who would take office on the consummation of the 1970 Acquisitions and would represent the interests of First Bank, Peoples Bank and Westbrook Trust. The required proxies were received at the annual meeting, and the 1970 Acquisitions were consummated on or about April 10, 1970. Prior to the consummation of the 1970 Acquisitions, the former stockholders of Eastern Trust were the owners of all the outstanding shares of the Association. Following the consummation of the 1970 Acquisitions, the former stockholders of Eastern Trust were the owners of approximately 35.27 per cent of the outstanding shares of the Association.[2]

C. *Summary of the Counts.*

The First through the Sixth Counts of the Complaint deal with the 1968–69 transactions. They are brought against all the defendants and can be summarized as follows:

*First Count.* This count is brought under Section 12(1) of the Securities Act (15 U.S.C. § 77l(1)) for liability allegedly resulting from the offer and sale of securities of the Association which had not been registered with the Securities and Exchange Commission in violation of Section 5 of the Securities Act (15 U.S.C. § 77e). The Complaint alleges that the exemption of state statutory mergers from the registration requirements of the Securities Act set forth in Rule 133 of the Securities and Exchange Commission (17 C.F.R. § 230.-133) was inapplicable to the 1968 Reorganization because defendants failed to comply with the merger requirements of Maine law.

*Second, Third and Fourth Counts.* These counts are brought, respectively, under Sections 12(2) and 17(a) of the Securities Act (15 U.S.C. §§ 77l(2) and 77q(a)) (Count II); Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)) and Rule 10b–5 (17 C.F.R. § 240.10b–5) promulgated thereunder by the Securities and Exchange Commission (Count III); and Section 14(e) of the Exchange Act (15 U.S.C. § 78n(e)) (Count IV). They allege misstatements and omissions in the 1968 Proxy Statement. The alleged misstatements and omissions include the failure of defendants to inform plaintiff that the 1968 Reorganization was not a valid statutory merger under Maine law and that therefore the exchange of securities in connection therewith was not exempt from registration under the Securities Act and the Maine Blue Sky Law; that plaintiff was not bound by the Maine merger statute to elect either to accept shares in the Association or to seek appraisal of her Eastern Trust shares; and that defendants contemplated and were negotiating for the acquisition of the three additional banks which were acquired in

2. In connection with the 1970 Acquisitions, the Association declared and issued to the former stockholders of Eastern Trust a stock dividend of 1.035 shares of common stock for each share outstanding. As a result of these transactions, plaintiff is now the record owner of 12,413 shares of the Association.

1970 and which resulted in the substantial dilution of plaintiff's interest in the Association.

*Fifth and Sixth Counts.* The Fifth and Sixth Counts are brought under principles of pendent jurisdiction for violation of the Maine Blue Sky Law, 32 M.R.S.A. § 751 et seq. They allege, respectively, misstatement and non-disclosure of material facts in the 1968 Proxy Statement in violation of 32 M.R.S.A. § 881 (Count V) and failure to comply with the registration requirements of 32 M.R.S.A. §§ 871 and 881 (Count VI). The Complaint alleges that the exemption pertaining to statutory mergers found in 32 M.R.S.A. § 874 did not apply because of the alleged invalidity of the merger.

The Seventh through the Tenth Counts of the Complaint deal with the 1970 Acquisitions. They are brought against the Association and those individual defendants who were then serving as officers and directors of the Association. The counts can be summarized as follows:

*Seventh, Eighth and Ninth Counts.* These counts allege misstatements and failures to disclose material facts in the 1970 Prospectus and the 1970 Proxy Statement. They are brought, respectively, under Sections 12(2) and 17(a) of the Securities Act (Count VII), Section 10 (b) of the Exchange Act and Rule 10b–5 thereunder (Count VIII), and Section 14 (e) of the Exchange Act (Count IX). The alleged untruths and omissions include the failure to disclose that the 1968 Reorganization was not a valid statutory merger under Maine law and the failure to disclose that the figures on which were based the relative "exchange ratios" used in the 1970 Acquisitions were out of date and inaccurate, resulting in the apportionment of a substantially lesser share of ownership to the former stockholders of Eastern Trust.

*Tenth Count.* This count is brought under principles of pendent jurisdiction. It sets forth a cause of action under the Maine Blue Sky Law for alleged untruths and omissions in the 1970 Prospectus and the 1970 Proxy Statement in violation of 32 M.R.S.A. § 881.

Under the First, Second, Fifth and Sixth Counts of the Complaint, plaintiff seeks the return of her original 1,525 shares of common stock of Eastern Trust. Under the Third and Fourth Counts, she seeks the return of her Eastern Trust shares or, alternatively, money damages. Under the Seventh through Tenth Counts, plaintiff seeks money damages. With respect to so much of the Second and Seventh Counts as states claims under Section 17(a) of the Securities Act, she also seeks punitive damages. Plaintiff seeks her costs, interest, and expenses of the litigation, including reasonable attorneys' fees.

## II

### THE MOTIONS FOR SUMMARY JUDGMENT

Defendants have moved for summary judgment on the First Count of the Complaint, which alleges a cause of action under Section 12(1) of the Securities Act; on the Sixth Count, which alleges a cause of action under the Maine Blue Sky Law, 32 M.R.S.A. §§ 871 and 881; and on those portions of the remaining counts which allege a failure to disclose in the 1968 Proxy Statement or in the 1970 Prospectus and Proxy Statement that the 1968 Reorganization was not a valid statutory merger under Maine law and that therefore no exemption from registration under federal and state law was available.[3]

Section 12(1) of the Securities Act[4] makes it unlawful to sell an unregistered

---

3. The challenged allegations in the remaining counts are those set forth in Paragraphs 8 and 9 of the Second Count and incorporated by reference thereafter in the Third, Fourth and Fifth Counts, and those set forth in Paragraph 22 of the Seventh Count and incorporated by refer-

ence in the Eighth, Ninth and Tenth Counts.

4. Section 12(1) of the Securities Act provides:
 [SEC. 12.] Any person who—
 (1) offers or sells a security in violation of section [5] . . .

security required to be registered by Section 5 of the Act.[5] Similarly, the Maine Blue Sky Law, 32 M.R.S.A. § 881,[6] makes it unlawful to sell non-exempt securities without filing the notice of intention and statement of information required by 32 M.R.S.A. § 871.[7] Defendants admittedly did not register the shares issued by the Association in connection with the 1968 Reorganization under either the Securities Act or the Maine Blue Sky Law. They claim, however, to come within the exemption from these registration requirements provided for statutory mergers by Rule 133 of the Securities and Exchange Commission [8] and by 32 M.R.S.A. § 874.[9] The Complaint alleges that the exemption for

* * * * *

shall be liable to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security.

5. Section 5 of the Securities Act provides in pertinent part:
[SEC. 5.] (a) Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly—
(1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; . . .

6. 32 M.R.S.A. § 881 provides in material part: § 881. *Civil liabilities*
1. *Liabilities.* Any person who
A. Sells a security in violation of section . . . 871 . . .
* * * * *
is liable to the person buying the security from him, who may sue to recover the consideration paid for the security, together with interest at 6% per year from the date of payment, costs and reasonable attorneys' fees, less the amount of any income received on the security, upon the tender of the security, or for damages if he no longer owns the security. Damages are the amount that would be recoverable upon a tender less the value of the security when the buyer disposed of it and interest at 6% per year from the date of disposition.

7. 32 M.R.S.A. § 871 provides in part:
§ 871. *Registration of securities; notice of intention to sell*
No security, not exempt under section 873, shall be sold, except in a transaction exempted by section 874, within this State, until there shall have been filed with the Bank Commissioner a notice of intention to sell such securi-

ty, accompanied by a filing fee of $25. . . .
Within 7 days after the filing of said notice, or such further time as the Bank Commissioner may allow in any case, there shall be filed with the Bank Commissioner a statement, upon such form as the Bank Commissioner may prescribe, containing, with any other relevant information prescribed by the Bank Commissioner in such form, the following information relative to such security and the issuer thereof: . . .

8. Rule 133 of the Securities and Exchange Commission provides in relevant part:
(a) For purposes only of Section 5 of the Act, no "sale," "offer," "offer to sell," or "offer for sale" shall be deemed to be involved so far as the stockholders of a corporation are concerned where, pursuant to statutory provisions in the state of incorporation or provisions contained in the certificate of incorporation, there is submitted to the vote of such stockholders a plan or agreement for a statutory merger or consolidation or reclassification of securities, . . . under such circumstances that the vote of a required favorable majority (1) will operate to authorize the proposed transaction as far as concerns the corporation whose stockholders are voting (except for the taking of action by the directors of the corporation involved and for compliance with such statutory provisions as the filing of the plan or agreement with the appropriate State authority), and (2) will bind all stockholders of such corporation except to the extent that dissenting stockholders may be entitled, under statutory provisions or provisions contained in the certificate of incorporation, to receive the appraised or fair value of their holdings.

9. 32 M.R.S.A. § 874 provides in pertinent part:
§ 874. *Exempted transactions and distributions*
The following transactions and distributions are exempt from section 871.
* * * * *

statutory mergers does not apply to the 1968 Reorganization because the purported "merger" was invalid under Maine law, since the former shareholders of Eastern Trust received shares, not in a resulting trust company, but in the Association, which was a holding company, and not a trust company. Such was the holding of Marcou v. Federal Trust Co., 268 A.2d 629 (Me.1970), where the Maine court held that a proposed transaction virtually identical to the present one would not meet the requirements for a Maine statutory merger because of a failure to provide stockholders of the original trust company with the right to receive shares in a "resulting trust company" as required by the Maine bank merger statute, 9 M.R.S.A. § 1225.[10]

Defendants do not assert that they complied with the Maine statutes governing the merger of trust companies, but rather argue that plaintiff may not show the invalidity of the merger because of a Certificate of Merger issued on March 19, 1969 by the Maine Bank Commissioner. The Certificate, which is set out in the margin,[11] states that Eastern Trust and Kenduskeag have complied with the merger requirements of Maine law, and it certifies that the Certificate is therefore issued to Eastern Trust as the bank resulting from the merger. Defendants' position is based in whole on 9 M.R.S.A. § 1227, which states in pertinent part:

> The commissioner shall . . . issue to the resulting bank a certificate of merger specifying the name of each merging bank and the name of the resulting trust company. *Such certificate shall be conclusive evidence of the merger and of the correctness of all proceedings therefor in all courts and places, and may be recorded in any office for the recording of deeds to evidence the new name in which the property of the merging banks is held.* (Emphasis supplied.)

Defendants thus contend that the validity of the merger has been conclusively established and that it is not open to plaintiff to question it in this action. They argue that, with the validity of the merger so established, the exemption under Rule 133 and 32 M.R.S.A. § 874 is

---

10. *Nonsales.* Any distribution of securities to its existing security holders by an issuer not involving a sale, including without limitation, stock dividends and stock splits, and any distribution or exchange of securities pursuant to a statutory merger or consolidation.

10. 9 M.R.S.A. § 1225 provides in material part:

> The board of directors of each merging trust company shall, by a majority of the entire board, approve a merger agreement which shall contain:
> * * * * *
> 3. *Converting shares.* Provisions governing the manner of converting the shares of the merging banks into shares of the *resulting trust company*; (Emphasis supplied.)

11. STATE OF MAINE
DEPARTMENT OF BANKS
AND BANKING
CERTIFICATE OF MERGER
Augusta
March 19, 1969
I, the undersigned, Deputy Bank Commissioner (the Acting Bank Commissioner) of the State of Maine, do hereby certify that the Kenduskeag Banking Company, a trust company duly organized under the provisions of 9 M.R.S.A., Chapter 93, and located at Bangor, County of Penobscot, State of Maine, and the Eastern Trust and Banking Company, a trust company duly organized under P. & S. Laws, 1887, Chapter 211, have complied with all of the requirements of 9 M.R.S.A. Chapter 103 precedent to the merger of said trust companies;
NOW THEREFORE, pursuant to 9 M.R.S.A. § 1227, this certificate of merger is issued to the Eastern Trust and Banking Company, the bank resulting from said merger.
IN WITNESS THEREOF, I have hereunto set my hand as said Deputy Bank Commissioner (the Acting Bank Commissioner), at Augusta, County of Kennebec, State of Maine, this 19th day of March, 1969.
 /s/ Irl E. Withee
 Deputy Bank Commissioner
 (The Acting Bank Commissioner)

clearly applicable, and there was, therefore, no requirement to register under either federal or state law and no duty to reveal, either in the 1968 Proxy Statement or in the 1970 Prospectus and Proxy Statement, any alleged invalidity of the merger. The sole basis of defendants' motions for summary judgment is that plaintiff may not in this proceeding show that the 1968 Reorganization was not a valid statutory merger under Maine law.

The view which this Court takes of the case makes it unnecessary to reach the question of whether the Bank Commissioner's Certificate is binding on this Court for purposes of applying the exemption provisions of Rule 133 and 32 M.R.S.A. § 874 relating to statutory mergers. Cf. S.E.C. v. National Securities Co., 393 U.S. 453, 461–463, 89 S.Ct. 564, 21 L.Ed.2d 668 (1969). This is so because defendants' argument misconceives the true nature of the 1968 Reorganization. Their position is that the whole reorganization was "a merger." That simply is not the case. As the Maine court pointed out in Marcou, "the Plan is a package containing a merger and an exchange [of stock]." Marcou v. Federal Trust Co., supra, 268 A.2d at 635. Even if the Bank Commissioner's Certificate is given the effect which defendants claim it should have, the Certificate at best is conclusive evidence of the validity of the merger between Eastern Trust and Kenduskeag. This is not, however, the transaction which

plaintiff charges gives rise to liability under Section 12(1) of the Securities Act and under the Maine Blue Sky Law. Plaintiff's claim arises from the exchange of stock between herself and the Association, which was the second step in defendants' two-step plan of reorganization.[12] In other words, the Certificate of Merger upon which defendants rely is, by virtue of 9 M.R.S.A. § 1227, conclusive evidence of, at most, the validity of the merger of the two constituent banks. It does not purport to speak to the subsequent exchange of securities, and it is of this exchange, not of the merger itself, that plaintiff complains. The exemption for statutory mergers provided by Rule 133 and 32 M.R.S.A. § 874 can reach only so far as to exempt the initial merger transaction. It does not reach beyond the merger to exempt the later distribution of unregistered stock, since it is clear that the exchange of stock was not pursuant to the Maine statutory provisions relating to mergers. Marcou v. Federal Trust Co., supra.

Defendants' motions for summary judgment are denied.

### III

### THE MOTIONS TO DISMISS

Defendants' motions to dismiss raise questions with respect to each and every one of the ten counts of the Complaint.[13] The defenses raised by the motions fall into three general categories: the statute of limitations, the absence of a civil remedy, and plaintiff's lack of standing.

12. The 1968 Proxy Statement is replete with evidence that defendants themselves viewed the 1968 Reorganization as a two-step plan, consisting of a merger followed by an exchange of stock. Thus, one of the stated purposes of the special meeting of stockholders called to act upon the plan of reorganization was "[t]o approve, as a step in such Plan of Reorganization, the merger of (Kenduskeag) into (Eastern Trust)." (emphasis supplied). Similarly, the Agreement and Plan of Reorganization, incorporated in the Proxy Statement, provides that following the merger of Kenduskeag and Eastern Trust, Eastern Trust shall, by virtue of such merger, receive all assets of Kenduskeag

and shall assume all of the liabilities of Kenduskeag, including without limitation, the obligation of the Exchange Agent (who by virtue of such merger shall have become the agent of Eastern Trust) to deliver shares of common stock of Associates to stockholders of Eastern Trust or to hold such stock for their account . . . ." (emphasis supplied).

13. Since the parties have filed affidavits with respect to the motions to dismiss presenting matters outside the Complaint, they agree that the motions are to be treated as motions for summary judgment, as required by Fed.R.Civ.P. 12(b).

These defenses will be separately considered with respect to each count as to which they are asserted.

## A. *The Counts Based on the 1968 Reorganization.*

### *Count I.*

■ Count I of the Complaint is brought under Section 12(1) of the Securities Act,[14] and alleges the sale of unregistered securities in violation of Section 5 of the Act.[15] The sole ground asserted by defendants in support of their motions to dismiss this count is that it is barred by the statute of limitations contained in Section 13 of the Act (15 U.S.C. § 77m), which states in pertinent part:

> *No action shall be maintained* to enforce any liability created under section [11] or [12(2)] unless brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence, or, *if the action is to enforce a liability created under section [12(1),] unless brought within one year after the violation upon which it is based.* . . . (emphasis supplied)

Since plaintiff's Section 12(1) claim arose at the latest in March 1969, and since the original complaint was filed in this Court on January 20, 1971, the clear language of the statute indicates that the Section 12(1) cause of action is barred by the one-year statute of limitations set forth in Section 13. Dack v. Shanman, 227 F.Supp. 26 (S.D.N.Y.1964); Athas v. Day, 186 F.Supp. 385 (D.Colo.1960). Plaintiff argues, however, that the statute of limitations was tolled by defendants' false assurances to plaintiff that

the sale of securities did not require registration under the Securities Act. The Complaint alleges that plaintiff did not become aware of these misrepresentations until a time less than one year before suit was brought.

■ Federal law has long been established that where a federally created cause of action has been fraudulently concealed, or where the cause of action is itself to recover for fraud, a federally established period of limitations does not begin to run until discovery. Bailey v. Glover, 88 U.S. (21 Wall.) 342, 22 L. Ed. 636 (1875); Traer v. Clews, 115 U.S. 528, 6 S.Ct. 155, 29 L.Ed. 467 (1885); Holmberg v. Armbrecht, 327 U.S. 392, 66 S.Ct. 582, 90 L.Ed. 743 (1946); Janigan v. Taylor, 344 F.2d 781, 784 (1st Cir.), cert. denied, 382 U.S. 879, 86 S.Ct. 163, 15 L.Ed.2d 120 (1965); Katz v. Amos Treat & Co., 411 F.2d 1046, 1054–1055 (2d Cir. 1969). "Where a plaintiff has been injured by fraud and 'remains in ignorance of it without any fault or want of diligence or care on his part, the bar of the statute does not begin to run until the fraud is discovered . . .'" Holmberg v. Armbrecht, *supra* 327 U.S. at 397, 66 S.Ct. at 585. The rule depends, however, upon a clear allegation of fraudulent concealment or fraud, Moviecolor Ltd. v. Eastman Kodak Co., 288 F.2d 80 (2d Cir. 1961), and fraud "means that the wrongdoer has contrived to deceive his victim . . . ." Dabney v. Levy, 191 F.2d 201, 204 (2d Cir.) (L. Hand, J.), cert. denied, 342 U.S. 887, 72 S.Ct. 177, 96 L.Ed. 665 (1951). *See* Restatement of Torts §§ 525, 526, 531. The cited cases establishing the federal tolling principle all entailed explicit, conscious deception, concealment and bad faith on the part of the defendants.[16]

---

14. Note 4, *supra.*

15. Note 5, *supra.*

16. Defendants' contention that the tolling principle is inapplicable where the time limitation is an integral part of the statute creating the cause of action and their further argument that a statute of limita-

tions is not tolled where the misstatements are of law and not of fact are both sufficiently answered by Glus v. Brooklyn Eastern District Terminal, 359 U.S. 231, 79 S.Ct. 760, 3 L.Ed.2d 770 (1959), in which the Supreme Court squarely rejected both contentions.

■ The Complaint falls far short of alleging fraud or fraudulent concealment with the particularity required to bring plaintiff within the federal tolling rule. As originally filed, the complaint lacked any such allegation. Prior to the hearing on the present motions, plaintiff stated her intention to file an amended complaint "which will contain allegations of fraud and bad faith." The amended complaint differs from the initial complaint only in that a new Paragraph 31 is added under the First Count. The new Paragraph 31 stops short, however, of alleging fraud. It is now alleged that defendants "knew . . . or should have known in the exercise of reasonable care" that the 1968 Reorganization was not exempt from the registration requirements of the Securities Act or that there was, at the very least, grave doubt as to the exemption. Such allegations are plainly not enough to charge the knowing and intentional misrepresentation necessary to make out a case of fraudulent concealment sufficient to toll the statute of limitations. Fed.R.Civ.P. 9(b); Merchant v. Davies, 100 U.S.App.

D.C. 258, 244 F.2d 347 (1957). *Cf.* Moviecolor Ltd. v. Eastern Kodak Co., *supra,* 288 F.2d at 86–88. An allegation of negligent misstatement is not enough.

■ Defendants' motions to dismiss Count I of the Complaint are granted.[17]

### *Count II.*

Count II of the Complaint is brought under Sections 12(2) and 17(a) of the Securities Act and is based upon alleged untruths and omissions in the 1968 Proxy Statement. In addition to rescission and compensatory damages, plaintiff seeks punitive damages under so much of the count as states a claim under Section 17(a).

■ 1. *The Section 12(2) Claim.* With respect to so much of Count II as asserts liability under Section 12(2) of the Securities Act,[18] defendants rely upon the statute of limitations contained in Section 13 of the Act, which states in pertinent part:

No action shall be maintained to enforce any liability created under . . Section [12(2)] unless brought within

---

17. It might be suggested that the dismissal should be without prejudice to permitting plaintiff to amend her complaint pursuant to Fed.R.Civ.P. 15(a) to allege fraud. *See* Merchant v. Davies, *supra,* 244 F.2d at 48–49. Plaintiff has, however, already amended her complaint, after the issue was thoroughly briefed, for the express purpose of alleging fraud sufficient to toll the statute of limitations. Quite evidently, she has alleged the most serious type of misrepresentation which she believes she can prove. Indeed, it appears highly unlikely that she could allege more than a negligent misstatement since the Complaint makes clear that the alleged defect in the 1968 Reorganization was not known until the 1970 *Marcou* litigation. Under these circumstances, no further leave to amend should be granted. *See* Mooney v. Vitolo, 435 F.2d 838 (2d Cir. 1970); Robison v. Caster, 356 F.2d 924 (7th Cir. 1966).

18. Section 12(2) of the Securities Act provides:

[SEC. 12.] Any person who—

\* \* \* \* \*

(2) offers or sells a security (whether or not exempted by the provisions of

section [3], other than paragraph (2) of subsection (a) [thereof]), by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission, shall be liable to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security.

one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence . . . ..

Thus, the period of limitations applicable to a Section 12(2) claim is one year after discovery of the untruth or omission or one year after the discovery should have been made in the exercise of reasonable diligence. This suit was commenced on January 20, 1971. Count II of the Complaint alleges that plaintiff first became informed of the alleged untruths and omissions less than one year before January 20, 1971, at various times between March 10, 1970 and August 14, 1970, and that she could not in the exercise of reasonable diligence have acquired such information prior thereto. These allegations are sufficient to withstand a motion to dismiss; an issue of fact is presented as to *when* plaintiff discovered or should have discovered the alleged untruths or omissions.

Defendants' motions to dismiss the Section 12(2) claim are denied.

2. *The Section 17(a) Claim.* With respect to so much of Count II as asserts a claim under Section 17(a) of the Securities Act, defendants, by these motions, assert three defenses: first, that there is no implied right of action for rescission or damages under Section 17 (a); second, that if an action does lie under Section 17(a), it is barred by the statute of limitations; and third, that no punitive damages are recoverable under Section 17(a). Since the Court concludes that there is no implied private remedy under Section 17(a), it does not reach defendants' other two defenses to this claim.

Section 17(a) of the Securities Act provides:

[SEC. 17.] (a) It shall be unlawful for any person in the offer or sale of any securities by the use of any means or instruments of transporta-
tion or communication in interstate commerce or by the use of the mails, directly or indirectly—

(1) to employ any device, scheme, or artifice to defraud, or

(2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

There clearly is no explicit civil remedy provided for by Section 17 (a); it is a criminal provision and, therefore, a private cause of action under that section which is brought independently of Section 12(2) can only be based upon "the general principle of tort law that violation of a provision of a criminal statute can, unless expressly or impliedly negatived by the statute itself, give rise to a civil remedy in tort." Trussell v. United Underwriters Ltd., 228 F.Supp. 757, 765 (D.Colo.1964); *cf.* Restatement, Second, Torts, § 286. The question presented has not been determined by the Supreme Court and is apparently one of first impression in this Circuit. It is true that some courts have assumed, without deciding, that a private civil remedy exists under Section 17(a) (*see, e. g.,* Katz v. Amos Treat & Co., 411 F.2d 1046, 1056 n. 10 (2d Cir. 1969); John Hopkins University v. Hutton, 326 F.Supp. 250 (D.Md.1971); Globus v. Law Research Service, Inc., 287 F.Supp. 188, 194 (S.D.N.Y.1968), modified, 418 F.2d 1276 (2d Cir. 1969), cert. denied, 397 U.S. 913, 90 S.Ct. 913, 25 L.Ed.2d 93 (1970)), and other courts have expressly recognized the existence of such a remedy (*see* Fischman v. Raytheon Mfg. Co., 188 F.2d 783, 787 n. 2 (2d Cir. 1951) (dictum); [19] Larson v. Tony's In-

19. Despite the *Katz* footnote and the *Fischman* dictum, the existence of a private action under Section 17(a) remains an open question in the Second Circuit. *See* Globus v. Law Research, Inc., 418 F.2d, *supra,* at 1283.

vestments, Inc., 46 F.R.D. 612 (M.D.Ala. 1968); Dack v. Shanman, 227 F.Supp. 26, 28–29 (S.D.N.Y.1964)). But other courts have denied a private remedy under Section 17(a), at least where the operative facts alleged are such as to come within Section 12(2). Trussell v. United Underwriters Ltd., *supra*, 228 F.Supp. at 768–769; Weber v. C. M. P. Corp., 242 F.Supp. 321, 323 (S.D.N.Y.1965); *cf.* Greater Iowa Corp. v. McLendon, 378 F.2d 783, 790 (8th Cir. 1967). And Judge Friendly, in his concurring opinion in S. E. C. v. Texas Gulf Sulphur Co., 401 F.2d 833, 864 (2d Cir. 1968), cert. denied, Coates v. S. E. C., 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969), has taken the position that Section 17 was not intended to be the basis of any private actions; that, on the other hand, there seems little practical point in denying a private action under Section 17 once it is established that a buyer has an action under Section 10(b) of the Exchange Act, "with the important proviso that fraud, as distinct from mere negligence, must be alleged"; [20] and that to go further "would totally undermine the carefully framed limitations imposed on the buyer's right to recover granted by § 12(2) of the 1933 Act." *Id.* at 867–868. The argument, based upon both legislative history and statutory construction, is persuasive that Section 17 (a) was intended only to afford a basis for injunctive relief and, if wilfulness is present, for criminal liability, and was not intended to provide a civil remedy for damages supplementing that afforded by Section 12(2). It is cogently stated by Professor Loss:

. . . In November 1933 Commissioner Landis of the of the Federal Trade Commission, who had played a prominent part in the drafting of the statute, stated in an address:

The suggestion has been made on occasion that civil liabilities arise also from a violation of Section 17, the first subsection of which makes unlawful the circulation of falsehoods and untruths in connection with the sale of a security in interstate commerce or through the mails. But a reading of this section in the light of the entire Act leaves no doubt but that violations of its provisions give rise only to a liability to be restrained by injunctive action or, if wilfully done, to a liability to be punished criminally.

Although this was said many years before the *Kardon* case, there is nothing novel about the doctrine of implied tort liability based on violation of a statute. The question is simply whether there is the same justification for implying such liability under the 1933 act as there is under the 1934 act. It is one thing to imply a private right of action under § 10(b) or the other provisions of the 1934 act, because the specific liabilities created by §§ 9(e), 16(b) and 18 do not cover all the variegated activities with which that act is concerned. But it is quite another thing to add an implied remedy under § 17(a) of the 1933 act to the detailed remedies specifically created by §§ 11 and 12. The 1933 act is a much narrower statute. It deals only with disclosure and fraud in the sale of securities. It has but two important substantive provisions, §§ 5 and 17(a). Noncompliance with § 5 results in civil liability under § 12(1). Faulty compliance results in liability under § 11. And § 17(a) has its counterpart in § 12(2). It all makes a rather neat pattern. Within the area of §§ 5 and 17(a), §§ 11 and 12 (unlike §§ 9(e), 16(b) and 18 of the 1934 act) are all-embracing. This is not to say that the remedies afforded by §§ 11 and 12 are complete. But the very restrictions contained in those sections

---

20. Even those courts which have implied a civil remedy under Section 17(a) have done so only where fraud, as distinct from mere negligence was present. Trussell v. United Underwriters Ltd., *supra*; Fisch-man v. Raytheon Mfg. Co., *supra*; *see* Weber v. C.M.P. Corp., *supra*; 6 Loss, Securities Regulation 3914 (2d ed. Supp. 1969). No fraud is alleged in Count II of the instant complaint.

and the differences between them—for example, the fact that § 11 but not § 12 imposes liability on certain persons connected with the issuer without regard to their participation in the offering and the fact that § 12(2) does not go so far in relation to § 17(a) as § 12(1) goes in relation to § 5—make it seem the less justifiable to permit plaintiffs to circumvent the limitations of § 12 by resort to § 17(a). Particularly is this so in view of the fact that § 11, together with the statute of limitations in § 13, was actually tightened in the 1934 amendments to the Securities Act. 3 Loss, Securities Regulation 1784–85 (2d ed. 1961).

In Count II of the present complaint, plaintiff has stated a cause of action under Section 12(2) of the Securities Act and the same operative facts are alleged in support of her Section 17(a) claim. The better view, which is adopted by this Court, is that under these circumstances plaintiff cannot sustain a separate cause of action under Section 17(a).

Defendants' motions to dismiss the Section 17(a) claim are granted.

*Count III.*

Count III of the Complaint is brought under Section 10(b) of the Exchange Act and Rule 10b–5 thereunder. It is based upon alleged untruths and omissions in the 1968 Proxy Statement. Defendants contend that this count is barred by the statute of limitations.

Section 10(b) of the Exchange Act provides in pertinent part:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange . . .

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

Rule 10b–5, the implementing rule promulgated under Section 10(b) by the Securities and Exchange Commission, provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

Although there is no explicit civil remedy provided for by either Section 10(b) or Rule 10b–5, a private cause of action arises by implication of the Act. Supt. of Insurance of the State of New York v. Bankers Life and Casualty Co., 404 U.S. 6, 13 n. 9, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971); Janigan v. Taylor, 344 F.2d 781, 783 (1st Cir.), cert. denied, 382 U.S. 879, 86 S.Ct. 163, 15 L.Ed.2d 120 (1965); Fischman v. Raytheon Mfg. Co., 188 F.2d 783, 787 (2d Cir. 1951). No statute of limitations is specified in the Securities Act or the Exchange Act as to claims arising under Rule 10b–5. Under such circumstances, it is established that the Court must look to state law for the applicable statute of limitations. Janigan v. Taylor, *supra*, 344 F.2d at 783; International Union United Automobile, etc., Workers v. Hoosier Cardinal Corp., 383 U.S. 696, 86 S.Ct. 1107, 16 L.Ed.2d 192 (1966); Holmberg v. Armbrecht, 327 U.S. 392, 66 S.Ct. 582, 90 L.Ed. 743 (1946). Since Maine is the

forum state, the parties reside in Maine, and the acts alleged to give rise to the cause of the action all occurred in Maine, it is appropriate to look to Maine law to determine the controlling limitation period. The local statute of limitations to be applied is the one which "best effectuates the federal policy involved." Vanderboom v. Sexton, 422 F.2d 1233, 1237 (8th Cir.), cert. denied, 400 U.S. 852, 91 S.Ct. 47, 27 L.Ed.2d 90 (1970); International Union, United Automobile, etc., Workers v. Hoosier Cardinal Corp., *supra*.

■■ Plaintiff contends that the Maine statute of limitations to be utilized is the general six-year statute of limitations for civil actions (14 M.R.S.A. § 752). If this statute is applicable, Count III is not time-barred. Plainly, however, the appropriate statute of limitations is found in Section 881 of the Maine Blue Sky Law, 32 M.R.S.A. § 881, which deals expressly with the sale of securities. The state analogue to Rule 10b–5 is Section 881(1) (B), which provides for the imposition of civil liability against

Any person who

. . . . . . .

B. Offers or sells a security, whether or not exempt or in an exempt transaction, by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, the buyer not

knowing of the untruth or omission, and who does not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the untruth or omission . . . . .

Section 881(4) provides that no action may be brought under Section 881(1) "more than 2 years after the contract of sale." This is the proper statute of limitations to apply since Section 881(1) (B) bears the closest resemblance to the federal cause of action under Rule 10b–5 asserted in Count III.[21] *Cf*. Vanderboom v. Sexton, *supra* 422 F.2d at 1236–1240; Batchelor v. Legg & Co., 52 F.R.D. 553 (D.Md.1971).[22]

■■ Even though a state statute is used to measure the limitation period, the more perplexing problem concerns the date of accrual of the federal cause of action. Defendants urge that this also is governed by state law and that therefore the limitation period began to run on the date of "the contract of sale" as specified in Section 881(4). Defendants argue that this was October 10, 1968, more than two years prior to the commencement of this action.[23] The established law, however, is contrary to defendants' position. As the First Circuit held in Janigan v. Taylor, *supra*,

federal law must determine the date of accrual here even though the period of limitation thereafter is determined by state law. 344 F.2d at 784.

Applying federal law, it is evident that, as the decided cases have consistently

21. That Section 881(1) is most closely analogous to plaintiff's federal law claim is further evidenced by the fact that in Count V of the Complaint plaintiff has asserted a Section 881(1) cause of action by merely realleging the operative facts asserted in Count II.

22. The Court is aware that in Janigan v. Taylor, *supra*, the First Circuit applied the Massachusetts two-year statute of limitations for general tort actions. Mass.G.L. c. 260, § 2A. The court did so, however, without discussing any other possible blue-sky type of statute. Furthermore, it appears that the limitation period in the Massachusetts Blue Sky

Law is also two years. Mass.G.L. c. 110A, § 18.

23. Even this contention must be rejected by the Court. For the reasons set forth in its discussion of Counts V and VI, *infra*, the Court is persuaded that the date of the contract of sale for purposes of Section 881(4) was March 18, 1969, the date when defendants declared the 1968 Reorganization effective. Since this date was less than two years prior to the commencement of the present action, plaintiff's claim would not be time-barred even if the accrual date is governed by state law.

held, the remedial purpose of the federal securities laws is best served by making the two-year limitation period begin to run, not on the date of the contract of sale, but on the date the alleged untruth or omission is or should have been discovered. Janigan v. Taylor, *supra*; Vanderboom v. Sexton, *supra* 422 F.2d at 1240; Batchelor v. Legg & Co., *supra*. Cf. Moviecolor, Ltd. v. Eastman Kodak Co., 288 F.2d 80, 83–86 (2d Cir.), cert. denied, 368 U.S. 821, 82 S.Ct. 39, 7 L.Ed. 2d 26 (1961).

The present suit was begun on January 20, 1971. Count III sufficiently alleges that plaintiff did not, and reasonably could not have, become aware of the alleged untruths and omissions until at least March 1970. Under the foregoing standard, an issue of fact is presented as to whether plaintiff's Rule 10b–5 claim is barred by the statute of limitations. That issue cannot be determined on the present motions.

Defendants' motions to dismiss Count III of the Complaint are denied.

*Count IV.*

 Count IV of the Complaint is brought under Section 14(e) of the Exchange Act. It is based upon the same alleged untruths and omissions in the 1968 Proxy Statement which form the basis of the §§ 12(2), 17(a) and 10(b) claims in Counts II and III. Count IV alleges that the 1968 Reorganization involved a "tender offer" by the Association to acquire the shares of Eastern Trust stockholders in exchange for Association shares, within the meaning of Section 14(e). Defendants seek dismissal of this count on three grounds: first, that the 1968 Reorganization did not involve a "tender offer" within the meaning of Section 14(e); second, that there is no implied right of action for damages under Section 14(e); and third, that any action under Section 14(e) is barred by the statute of limitations. Since the Court is persuaded that the 1968 Reorganization did not constitute a "tender offer" within the meaning of Section 14(e), it is not necessary to consider defendants' other two contentions.

Section 14(e) of the Exchange Act provides:

It shall be unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer or request or invitation for tenders, or any solicitation of security holders in opposition to or in favor of any such offer, request, or invitation. The Commission shall, for the purposes of this subsection, by rules and regulations define, and prescribe means reasonably designed to prevent, such acts and practices as are fraudulent, deceptive, or manipulative.

The federal securities laws do not contain any statutory definition of a "tender offer." The legislative history, however, makes clear that the type of activity intended to be regulated by Section 14(e), and its companion Sections 14(d) and 14(f), is the acquisition of control of a corporation by outsiders through the purchase of its shares. These three subsections dealing with tender offers were added to Section 14 by a 1968 Amendment to the Exchange Act. P.L. 90–439 § 3, 82 Stat. 455 (1968). They were adopted as a group to regulate the takeover of a business by an outside entity by means of a cash tender offer made to the shareholders of the "target" company to buy their stock. Iroquois Industries, Inc. v. Syracuse China Corp., 417 F.2d 963, 969 (2d Cir. 1969), cert. denied, 399 U.S. 909, 90 S.Ct. 2199, 26 L.Ed.2d 561 (1970); *see* 8 Hou.L.Rev. 155 (1970). The purpose was to close a gap in existing law; cash tender offers were exempt from disclosure provisions, whereas alternative methods of obtaining control, as through proxy contests, were not exempt. Electronic Specialty Co. v. In-

ternational Controls Corp., 409 F.2d 937, 945 (2d Cir. 1969). "The failure of prior law 'to provide adequate disclosure to investors in connection with a cash takeover bid' was one of the principal reasons for enactment of the new statutory provisions." Susquehanna Corp. v. Pan American Sulphur Co., 423 F.2d 1075, 1085 (5th Cir. 1970); Bath Industries, Inc. v. Blot, 427 F.2d 97, 102 (7th Cir. 1970). The House Report on the bill (H.R.Rep. No. 1711, 90th Cong., 2d Sess. (1968), 1968 U.S.Code Cong. & Admin.News, pp. 2811–2823), excerpts from which are set out in the margin,[24] amply demonstrates that the amendments are directed at bids from outside groups to acquire corporate control. The Report noted that cash tender offers had "be-

come an increasingly favored method for taking over control of publicly held corporation"; that, because existing laws had no disclosure requirements for tender offers, stockholders of the target corporation did not have adequate information to decide whether to tender their shares or not; that the failure to provide for adequate disclosure to investors in connection with tender offers was "in sharp contrast" to the disclosure requirements applicable where one company offers to exchange its shares for those of another, or where a contest for control takes the form of a proxy fight; and finally, that the purpose of the bill was to correct "the current gap" in the federal securities laws to provide for full disclosure in connection with tender offers.

24. The cash tender offer has become an increasingly favored method of acquiring control of publicly held corporations. The offer normally consists of a bid by an individual or group to buy shares of a company—usually at a price above the current market price. Those accepting the offer are said to tender their stock for purchase. The person making the offer obligates himself to purchase all or a specified portion of the tendered shares if certain specified conditions are met.
1968 U.S.Code Cong. & Admin.News at p. 2811.

The failure to provide adequate disclosure to investors in connection with a cash takeover bid or other acquisitions which may cause a shift in control is in sharp contrast to the regulatory requirements applicable where one company offers to exchange its shares for those of another, or where a contest for control takes the form of a proxy fight.

Where one company seeks control of another by means of a stock-for-stock exchange, the offer must be registered under the Securities Act of 1933. The shareholder gets a prospectus setting forth all material facts about the offer. He knows who the purchaser is, and what plans have been made for the company. He is thus placed in a position to make an informed decision whether to hold his stock or to exchange it for the stock of the other company.

Where corporate control is sought through a proxy contest, the Securities

Exchange Act requires that shareholders be informed of the identity of the participants and their associates, their shareholdings and when they acquired them. When shares are purchased with borrowed funds, the identity of the lender must be disclosed if the funds were obtained otherwise than through a bank loan or margin account. In both the exchange offer and the proxy fight the information is filed with the Securities and Exchange Commission and is subject to statutory requirements and sanctions.

In contrast when a cash tender offer is made, no information need be filed or disclosed to shareholders. Such an offer can be made on the most minimal disclosure; yet the investment decision— whether to retain the security or sell it —is in substance little different from the decision made on an original purchase of a security, or on an offer to exchange one security for another.
1968 U.S.Code Cong. & Admin.News at pp. 2812–13.

The bill would correct the current gap in our securities laws by amending the Securities Exchange Act of 1934 to provide for full disclosure in connection with cash tender offers and other techniques for accumulating large blocks of equity securities of publicly held companies. Under this bill, the material facts concerning the identity, background, and plans of the person or group making a tender offer or acquiring a substantial amount of securities would be disclosed.
1968 U.S.Code Cong. & Admin.News at p. 2814.

Under Maine law, the 1968 Reorganization was a "package" involving a merger between Eastern Trust and Kenduskeag and an exchange of stock between the former stockholders of Eastern Trust and the Association. Marcou v. Federal Trust Co., *supra*, 268 A.2d at 635. As this Court has held in denying defendants' motions for summary judgment,[25] the exchange of stock was not exempt from the disclosure requirements of the Securities Act. Therefore, any untruths or omissions in the 1968 Proxy Statement were subject to the sanctions provided by Sections 12(2), 17(a) and 10 (b).[26] The shareholders of Kenduskeag and of the Association were all shareholders of Eastern Trust. No outside entity or group was involved. There was no contest for control. *Compare, e. g.,* Electronic Specialty Co. v. International Controls Corp., *supra*. With the exception of those individual shareholders of Eastern Trust who elected to exercise their cash appraisal rights, the ownership of the Association upon consummation of the Plan was the same as the ownership of Eastern Trust prior thereto. The Plan proposed no more than a change in corporate structure. In short, the 1968 Reorganization did not entail any change in corporate control or any form of takeover bid of the type intended to be regulated by Section 14(e) of the Exchange Act.

Defendants' motions to dismiss Count IV of the Complaint are granted.

*Counts V and VI.*

██ ██ Counts V and VI of the Complaint assert claims under the Maine Blue Sky Law upon principles of pendent jurisdiction. Hurn v. Oursler, 289 U.S. 238, 53 S.Ct. 586, 77 L.Ed. 1148 (1933). Count V is brought under 32 M.R.S.A. § 881(1) (B) [27] and is based upon the same alleged untruths and omissions in the 1968 Proxy Statement which form the basis of plaintiff's federal law claims in Counts II, III and IV. Count VI is brought under 32 M.R.S.A. § 881(1) (A) [28] and alleges the sale of unregistered securities in violation of 32 M.R.S.A. § 871.[29] Defendants assert that these counts are barred by the statute of limitations applicable to Section 881 actions, 32 M.R.S.A. § 881(4), which states:

No person may sue under this section more than 2 years after the contract of sale.

Plaintiff does not dispute that this is the statute of limitations applicable to the claims asserted in these counts.

Defendants contend that the present suit, which was commenced on January 20, 1971, was brought more than 2 years after the date of the contract of sale, which they allege was October 10, 1968, the date of the special stockholders meeting at which the shareholders of Eastern Trust approved the proposed reorganization plan. That is the date, they argue, when plaintiff, together with the other nondissenting Eastern Trust stockholders, became obligated to exchange her Eastern Trust shares for shares of the Association. It seems clear, however, that Section 881(4) looks to the date on which the seller becomes obligated to sell the securities as to which Section 881 violations are charged. Here, Counts V and VI allege violations of Section 881 in connection with the "sale" of Association securities. The record shows unequivocally that it was not until March 18, 1969, the date on which the plan of reorganization was declared effective, that the Association became obligated to exchange its shares for the shares of Eastern Trust. In fact, the Agreement and Plan of Reorganization, a copy of which was appended to the 1968 Proxy Statement, expressly reserved to the management of Eastern Trust the

---

25. *See* Part II, *supra*.

26. As Judge Friendly notes in Electronic Specialty Co. v. International Controls Corp., *supra*, Section 14(e) largely tracks the substantive provisions of Rule 10b–5. 409 F.2d at 945.

27. Page 906, *supra*.

28. Note 6, *supra*.

29. Note 7, *supra*.

right, in its sole discretion, to abandon the Plan if the number of dissenting shareholders was "unduly large" or if any condition specified in the Plan could not be met. A contract requires a mutually binding agreement between the parties. As of October 1968, Eastern Trust and the Association were not bound to anything. There was no contract of sale which plaintiff could enforce until March 1969, when the Plan was declared effective. Only then did there come into evidence "a complete and present cause of action" upon which plaintiff could sue. *Cf.* Rawlings v. Ray, 312 U.S. 96, 98, 61 S.Ct. 473, 474, 85 L.Ed. 605 (1941).

Since this suit was brought within the time prescribed by 32 M.R.S.A. § 881 (4), defendants' motions to dismiss Counts V and VI of the Complaint are denied.

## B. *The Counts Based on the 1970 Acquisitions.*

### Count VII.

■ Count VII of the Complaint is brought under Sections 12(2) and 17(a) of the Securities Act and is based upon alleged untruths and omissions in the 1970 Prospectus.

1. *The Section 12(2) Claim.* With respect to so much of Count VII as asserts liability under Section 12(2) of the Securities Act,[30] defendants contend that plaintiff, not being a purchaser of securities at the time of the 1970 Acquisitions, does not have standing to assert such a claim. Defendants are clearly correct. Only purchasers have standing to sue for violations of Section 12(2) of the Securities Act. Greater Iowa Corp. v. McLendon, 378 F.2d 783, 789–791 (8th Cir. 1967); Berne Street Enterprises, Inc. v. American Export Isbrandtsen

Co., Inc., CCH Fed.Sec.L.Rep. ¶ 92,711 at 99,113 (S.D.N.Y.1970); Most v. Alleghany Corp., CCH Fed.Sec.L.Rep. ¶ 92,583 at 98,664 (S.D.N.Y.1970).

■ Plaintiff's argument that the diminution of the percentage of Association shares owned by her as a result of the 1970 Acquisitions amounted to a "purchase" by her of a new interest in the Association is ingenious, but not persuasive. It is undisputed that plaintiff had acquired her shares of Association stock in March 1969, well prior to the 1970 Acquisitions. Section 12(2) creates liability only in favor of "the person *purchasing* such security . . . ." (emphasis supplied). The plain fact is that plaintiff was not a purchaser of Association securities in connection with the 1970 Acquisitions.[31] She therefore has no standing to assert the present Section 12(2) claim.

Defendants' motions to dismiss the Section 12(2) claim are granted.

■ 2. *The Section 17(a) Claim.* With respect to so much of Count VII as asserts a claim under Section 17(a) of the Securities Act,[32] defendants assert two defenses: first, that there is no implied right of action for rescission or damages under Section 17 (a); and second, that if an action does lie under Section 17(a), plaintiff does not have standing to assert such a claim because she was not a purchaser of securities.[33]

In its consideration of the Section 17(a) claim in Count II, the Court has held that there is no implied private remedy under Section 17(a). That conclusion is sufficient to dispose of the Section 17(a) claim in the present count. In addition, for the reasons stated by the Court in dismissing the

---

30. Note 18, *supra.*

31. *See also* the discussion of Count VIII, *infra.*

32. Page 903, *supra.*

33. Defendants also seek dismissal of plaintiff's prayer for punitive damages under

her Section 17(a) claim, a question which the Court does not reach in view of its conclusion that this claim in any event must be dismissed.

Section 12(2) claim in this count, the Court holds that, even if a private action would lie under Section 17(a), plaintiff, not being a purchaser of securities, lacks standing to assert such a claim. The established rule that "[o]nly purchasers have standing to sue for violations of the 1933 Act," Simmons v. Wolfson, 428 F.2d 455, 456 (6th Cir. 1970), cert. denied, 400 U.S. 999, 91 S.Ct. 459, 27 L.Ed.2d 450 (1971), is specifically applicable to Section 17(a) claims. *Id.*; Greater Iowa Corp. v. McLendon, *supra*; Berne Street Enterprises, Inc. v. American Export Isbrandtsen Co., Inc., *supra*; Most v. Alleghany Corp., *supra*. *See* Supt. of Insurance of the State of New York v. Bankers Life and Casualty Co., 430 F.2d 355, 359 (2d Cir. 1970), rev'd on other grounds, 404 U.S. 6, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971); Iroquois Industries, Inc. v. Syracuse China Corp., 417 F.2d 963, 966 (2d Cir. 1969), cert. denied, 399 U.S. 909, 90 S.Ct. 2199, 26 L.Ed.2d 561 (1970); Birnbaum v. Newport Steel Corp., 193 F.2d 461, 463 (2d Cir.), cert. denied, 343 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1356 (1952).

Defendants' motions to dismiss the Section 17(a) claim are granted.

*Count VIII.*

Count VIII of the Complaint is brought under Section 10(b) of the Exchange Act and Rule 10b–5 thereunder.[34] It is based upon alleged untruths and omissions in the 1970 Prospectus and the 1970 Proxy Statement. Defendants contend that plaintiff may not recover under Section 10(b) or Rule 10b–5 because she was not a purchaser or seller of securities at the time of the 1970 Acqui-

sitions and thus has no standing to sue. The Court agrees.

 It has long been settled that in order to maintain an action under Section 10(b) of the Exchange Act or Rule 10b–5 thereunder, at least insofar as actions for damages are concerned,[35] the plaintiff must have been a purchaser or seller of the securities involved. Birnbaum v. Newport Steel Corp., 193 F.2d 461 (2d Cir.), cert. denied, 343 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1356 (1952); Herpich v. Wallace, 430 F.2d 792, 803–807 (5th Cir. 1970); Supt. of Insurance of the State of New York v. Bankers Life and Casualty Co., 430 F.2d 355, 359–360 (2d Cir. 1970), rev'd on other grounds, 404 U.S. 6, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971); Simmons v. Wolfson, 428 F.2d 455, 456 (6th Cir. 1970), cert. denied, 400 U.S. 999, 91 S.Ct. 459, 27 L.Ed. 2d 450 (1971); Rekant v. Desser, 425 F.2d 872, 877 (5th Cir. 1970); Iroquois Industries, Inc. v. Syracuse China Corp., 417 F.2d 963, 965 (2d Cir. 1969), cert. denied, 399 U.S. 909, 90 S.Ct. 2199, 26 L.Ed.2d 561 (1970); Greenstein v. Paul, 400 F.2d 580, 581 (2d Cir. 1968); Greater Iowa Corp v. McLendon, 378 F.2d 783, 791–792 (8th Cir. 1967). The purchaser-seller requirement for actions under Section 10(b) and Rule 10b–5 was, of course, first set forth by the Second Circuit in Birnbaum v. Newport Steel Corp., *supra*. Although it has been criticized as too strict a reading of the Rule, *see*, *e. g.*, Lowenfels, The Demise of the Birnbaum Doctrine: A New Era for Rule 10b–5, 54 Va.L.Rev. 268 (1968), it has been consistently reaffirmed by the Second Circuit, *see*, *e. g.*, Drachman v. Harvey, 453 F.2d 722 at 730 (2d Cir. 1971); Iroquois Industries, Inc. v. Syracuse China Corp., *supra*, 417 F.2d at 965,

---

34. Page 905, *supra*.

35. *Compare* Mutual Shares Corp. v. Genesco, Inc., 384 F.2d 540 (2d Cir. 1967) and Kahan v. Rosenstiel, 424 F.2d 161 (3rd Cir.), cert. denied, Glen Alden Corp. v. Kahan, 398 U.S. 950, 90 S.Ct. 1870, 26 L.Ed.2d 290 (1970). In *Genesco*, the Second Circuit held that plaintiffs, not being purchasers or sellers of the stock in-volved, had no claim for damages under Section 10(b) or Rule 10b-5, but were entitled to injunctive relief. In *Kahan*, the Third Circuit held that the purchaser-seller requirement might be relaxed to permit an injunction "to enjoin deceptive practices which if continued would lead to completed purchases or sales." 424 F.2d at 173.

and Professor Loss has approved the requirement as "basically correct." 6 Loss, Securities Regulation 3617 (1969 Supp.); 3 Loss, Securities Regulation 1469 (2d ed. 1961). As the Fifth Circuit has observed, "[b]loody but unbowed, *Birnbaum* still stands." Rekant v. Desser, *supra*, 425 F.2d at 877. This Court finds no reason to depart from the *Birnbaum* rule in the present case.[36]

Plaintiff argues that the purchaser-seller limitation first laid down in *Birnbaum* has been substantially eroded by recent case law, especially in the Second Circuit. It is true that the purchaser-seller requirement has been liberalized by expanded definitions of "purchaser" and "seller." *See, e. g.*, Vine v. Beneficial Finance Co., 374 F.2d 627, 632–636 (2d Cir.), cert. denied, 389 U.S. 970, 88 S.Ct. 463, 19 L.Ed.2d 460 (1967) (requirement met with respect to a shareholder forced to turn in his shares to recover appraisal rights pursuant to a merger: a "forced" seller); A. T. Brod & Co. v. Perlow, 375 F.2d 393, 397 n. 3 (2d Cir. 1967) (requirement met as to a broker who purchased securities from third persons for a customer: a purchaser entitled to sue his customer for fraudulent orders); Crane Co. v. Westinghouse Air Brake Co., 419 F.2d 787, 797–799 (2d Cir. 1969), cert. denied, 400 U.S. 822, 91 S.Ct. 41, 27 L.Ed.2d 50 (1970) (requirement met as to a corporation induced to sell securities by fraud: a "forced" seller); Coffee v. Permian Corp., 434 F.2d 383 (5th Cir. 1970) (requirement met as to a shareholder whose shares were converted into a claim for cash as the result of a corporate liquidation: a "forced" seller).[37] In each of these cases, however, the plaintiff was found to be an actual or constructive "seller" or "purchaser" of shares, and the fraud alleged was in connection with such sale or purchase. The purchaser-seller requirement was not eliminated. Greenstein v. Paul, *supra*; Iroquois Industries, Inc. v. Syracuse China Corp., *supra*.

Under no theory was plaintiff here a purchaser or seller of Association shares at the time of the 1970 Acquisitions. Her claim is bottomed upon the Association's acquisition of three banks by means of a stock-for-stock exchange. She does not allege that she was a shareholder in any of the three banks. Her sole allegation is that because her percentage ownership of Association stock was less after the acquisitions than before, she thereby "purchased" from defendants a new interest in the Association. Despite the admittedly broad construction which has been given to Rule 10b–5, it remains an "essential requirement" that the stockholder, in order to recover damages, must be a party to an exchange. Berne Street Enterprises, Inc. v. American Export Isbrandtsen Co., Inc., CCH Fed.Sec.L.Rep. ¶ 92,711 at 99,-134 (S.D.N.Y.1970). "[A] purchaser of securities is one who was a party to a transaction whereby he was to assume ownership of securities in exchange for valuable consideration." Supt. of Insurance of the State of New York v. Bankers Life and Casualty Co., 300 F.Supp. 1083, 1098 (S.D.N.Y.1969), aff'd, 430 F.2d 355 (2d Cir. 1970), rev'd on other grounds, 404 U.S. 6, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971). Plaintiff was not such a party. In reality, plaintiff was no more a purchaser of securities as the result of the 1970 Acquisitions than she would have been if the Association had acquired the stock of the three banks by means of a cash purchase.

36. The Supreme Court has not spoken to the question, *see* Supt. of Insurance of the State of New York v. Bankers Life and Casualty Co., *supra*, 404 U.S. at 6 n. 10, 92 S.Ct. 165; neither has the First Circuit.

37. Contrary to the suggestion in plaintiff's brief, the Fifth Circuit in *Permian* did not hold that the plaintiff was a purchaser for purposes of Section 10(b) because her proportionate share in the defendant corporation increased as a result of a coerced redemption of stock by the majority shareholders. *See* 434 F.2d at 386. The District Court in *Permian* held that the plaintiff was not a purchaser. 306 F.Supp. 1371, 1374 (N.D.Tex.1969).

As an alternative theory, although not alleged in the Complaint, plaintiff argues that she may be considered a "seller" of securities for purposes of Section 10(b) and Rule 10b–5, because the decrease in her proportional ownership of the Association as a result of the 1970 Acquisitions amounted to a "sale" by her of an interest in the Association. Here, too, however, "[t]he fact is that plaintiff has not purchased, sold or exchanged [her] . . . share in connection with the alleged fraud but has continued at all times to hold [her] shares." Berne Street Enterprises, Inc. v. American Export Isbrandtsen Co., Inc., *supra* at 99,133. In short, the facts alleged in the Complaint do not fall within even the most expansive definition of "purchaser" or "seller" in the decided cases. Plaintiff was neither an actual, nor a prospective, purchaser or seller. She speaks, not as an investor, but as a shareholder complaining of alleged corporate mismanagement. *Cf.* Greenstein v. Paul, *supra*; Cooper v. Garza, 431 F. 2d 578 (5th Cir. 1970). "Appropriate remedies to redress said wrongs now exist in the state courts." Simmons v. Wolfson, *supra*, 428 F.2d at 457.

Defendants' motions to dismiss Count VIII of the Complaint are granted.

### Count IX.

Count IX of the Complaint is brought under Section 14(e) of the Exchange Act. It is based upon the same alleged untruths and omissions in the 1970 Prospectus and the 1970 Proxy Statement which form the basis of the §§ 12(2), 17(a) and 10(b) claims in Counts VII and VIII. Count IX alleges, and defendants concede, that the 1970 Acquisitions were made by means of a "tender offer" by the Association, whereby the Association acquired the shares of the stock-holders of the three acquired banks in exchange for Association shares, within the meaning of Section 14(e). Defendants seek dismissal of this count on two grounds: first, that there is no implied right of action for damages under Section 14(e); and second, that if an action does lie under Section 14(e), plaintiff, not being a purchaser or seller of securities in connection with the 1970 Acquisitions, does not have standing to assert such a claim.

*1. Civil Remedy Under Section 14(e).* Section 14(e) of the Exchange Act, which was set out in the discussion of Count IV,[38] contains no explicit provision for a civil remedy; therefore, if a private civil remedy exists under the statute, it must arise by implication. Defendants argue that only a right to injunctive relief,[39] and not a right to damages, should be implied. This Court is persuaded, however, that an implied right of action for damages does lie under Section 14(e).

As noted in the discussion of Count IV, Section 14(e) together with its related Sections 14(d) and 14(f), was added to Section 14 by a 1968 amendment to the Exchange Act. P.L. 90–439, § 3, 82 Stat. 455 (1968). Their purpose was to fill a gap in existing law, under which tender offers were exempt from disclosure provisions. Bath Industries Inc. v. Blot, 427 F.2d 97, 102 (7th Cir. 1970); Susquehanna Corp. v. Pan American Sulphur Co., 423 F.2d 1075, 1085 (5th Cir. 1970); Electronic Specialty Co. v. International Controls Corp., 409 F.2d 937, 945 (2d Cir. 1969). The legislative history, H.R.Rep.No.1711, 90th Cong., 2d Sess. (1968), 1968 U.S.Code Cong. & Admin.News, pp. 2811–2823; *see* 8 Hou. L.Rev. 155 (1970), and the similarity between the substantive provisions of Section 14(e) and Rule 10b–5 [40] make clear

---

38. Page 907, *supra*.

39. The courts have recognized that injunctive relief is available under Section 14(e). *E. g.*, Electronic Specialty Co. v. International Controls Corp., 409 F.2d 937 (2d Cir. 1969).

40. The principal difference is that Rule 10b–5 has as its final phrase "in connection with the purchase or sale of any security," while Section 14(e) concludes "in connection with any tender offer or request or invitation for tenders, or

that the intent of Congress in enacting Section 14(e) was to make available to those defrauded in connection with tender offers the full arsenal of remedies available under Section 10(b) and its implementing Rule 10b–5 to those defrauded in connection with purchases or sales of securities. Electronic Specialty Co. v. International Controls Corp., *supra*, 409 F.2d at 940.

 It is well established that although there is no explicit civil remedy provided for by either Section 10(b) or Rule 10b–5, a private cause of action arises by implication of the Act. Supt. of Insurance of the State of New York v. Bankers Life and Casualty Co., 404 U.S. 6 at 13 n. 9, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971); Janigan v. Taylor, 344 F.2d 781, 783 (1st Cir.), cert. denied, 382 U.S. 879, 86 S.Ct. 163, 15 L.Ed.2d 120 (1965); Fischman v. Raytheon Mfg. Co., 188 F.2d 783 (2d Cir. 1951). A sensible and coherent interpretation of the provisions of the two statutes mandates implication of a damage remedy under Section 14(e) corresponding to that available under Section 10(b). There is every reason to believe that Congress intended the remedies to be similar. The only two courts which have considered the question have arrived at the same conclusion. Fabrikant v. Jacobellis, CCH Fed.Sec.L.Rep. ¶ 92,686 (E.D. N.Y.1970); Neuman v. Electronic Specialty Co., CCH Fed.Sec.L.Rep. ¶ 92,591 (N.D.Ill.1969).[41]

 2. *Plaintiff's Standing Under Section 14(e)*. Section 14(e) makes unlawful any untruth or omission "in connection with any tender offer or request or invitation for tenders, or any solicitation of security holders in opposition to or in favor of any such offer, request, or invitation." Unlike Section 10(b), Section 14(e) contains no hint of a purchaser-seller requirement. The decided cases under Section 14(e) have granted standing to claim its protection to the corporation which is the target of the takeover bid, Electronic Specialty Co. v. International Controls Corp., *supra*; to nontendering shareholders of the target corporation, *id.*; Fabrikant v. Jacobellis, *supra*; Neuman v. Electronic Specialty Co., *supra*; and to the tender offeror itself, Crane Co. v. Westinghouse Air Brake Co., 419 F.2d 787, 797–799 (2d Cir. 1969), cert. denied, 400 U.S. 822, 91 S.Ct. 41, 27 L.Ed.2d 50 (1970). Plaintiff was a shareholder of the tender offeror. Although this Court is aware of no case in which standing was granted under Section 14(e) to one in plaintiff's position, a determination that she has standing is both logical and compatible with the purpose of the statute. In determining who has standing to sue under Section 14(e), the "quest must be for what will best accomplish the purposes of the legislature." Electronic Specialty Co. v. International Controls Corp., *supra*, 409 F.2d at 946. The purpose of Congress in enacting Section 14(e) was to protect the investing public from harm caused by misleading tender offers.[42] Shareholders of the offeror are plainly within the class for whom such protection was designed. Plaintiff is such a shareholder, and effectuation of the Congressional purpose requires that she be granted standing to maintain the present suit.

Defendants' motions to dismiss Count IX of the Complaint are denied.

*Count X.*

 Count X of the Complaint asserts a claim under the Maine Blue Sky Law upon principles of pendent jurisdiction. It is brought under 32 M.R.S.A.

any solicitation of security holders in opposition to or in favor of any such offer, request, or invitation." Judge Friendly has observed in Electronic Specialty Co. v. International Controls Corp., 409 F.2d 937 (2d Cir. 1969), that Section 14(e) "largely tracks the substantive provisions of Rule 10b–5," *id.* at 945, and "[i]n ef-

fect . . . applies Rule 10b–5 both to the offeror and to the opposition." *Id.* at 940.

41. Neither the Supreme Court nor any Circuit Court has spoken to the question.

42. *See* discussion of Count IV.

§ 881(1) (B) and is based upon the same alleged untruths and omissions in the 1970 Prospectus and the 1970 Proxy Statement which form the basis of plaintiff's federal law claims in Counts VII, VIII and IX. Defendants contend that plaintiff does not have standing to assert such a claim because she was not a purchaser of securities at the time of the 1970 Acquisitions. Defendants are plainly right. Section 881(1) (B),[43] which adopts the basic language of Section 12(2) of the Securities Act, provides for liability of the seller of a security "to the person buying the security from him . . .." As the Court has held in its discussion of Count VII, plaintiff was not a purchaser of Association securities in connection with the 1970 Acquisitions. She, therefore, has no standing to assert her present Section 881 claim.

Defendants' motions to dismiss Count X of the Complaint are granted.

## IV

### THE McDONALD MOTION TO DISMISS

Manuel C. McDonald is named as a defendant in the first six counts of the Complaint, the counts based on the 1968 Reorganization. He has moved for dismissal, as to him, of Counts I and II, on the ground of improper venue (Fed.R. Civ.P. 12(b) (3)), and of Counts V and VI, on the grounds of lack of personal jurisdiction, insufficiency of process and insufficiency of service of process (Fed. R.Civ.P. 12(b) (2), (4), (5)). For the reasons to be briefly stated, the motion is denied in all respects.

#### A. *Venue Under Counts I and II.*

Counts I and II of the Complaint are brought, respectively, under Section 12

(1) (Count I) and Sections 12(2) and 17(a) (Count II) of the Securities Act. The applicable venue provision is Section 22(a) of the Act, 15 U.S.C. § 77v (a), which provides that any such action may be brought

. . . in the district wherein the defendant is found or is an inhabitant or transacts business, or in the district where the offer or sale took place, if the defendant participated therein, and process in such cases may be served in any other district of which the defendant is an inhabitant or wherever the defendant may be found.

The affidavit filed by McDonald in support of his motion shows that at the time this action was commenced, he was not an inhabitant within the District of Maine, nor was he found nor did he transact any business within this district.[44] Accordingly, venue under Section 22(a) is proper only if McDonald participated in the 1968 Reorganization, which for the purposes of his motion he admits took place in this district.

 The affidavit states that McDonald was a Trustee of Eastern Trust and a Director of the Association at the time of the 1968 Reorganization and that in these capacities he attended meetings of the Board of Trustees of Eastern Trust and the Board of Directors of the Association at which the 1968 Reorganization was discussed and resolutions relating thereto were adopted. Defendant argues that he was but one of twelve active Trustees of Eastern Trust and but one of twelve active Directors of the Association, but he does not contest that these twelve individuals had full control of the Association during the relevant period. *Prima facie,* such a person is a controlling person within the meaning of Section 15 of the Act.[45] Klapmeier

---

43. Page 906, *supra.*

44. The affidavit recites that McDonald has been a resident of Florida and has not transacted any business in Maine since he moved from Maine to Florida on or about September 1, 1969. Service in this action was made upon him personally at his Florida residence by a United States Marshal.

45. Section 15 of the Securities Act, 15 U.S.C. § 77o provides:

Every person who, by or through stock ownership, agency, or otherwise, or who, pursuant to or in connection with an

v. Telecheck International, Inc., 315 F. Supp. 1360, 1361 (D.Minn.1970); Larson v. Tony's Investments, Inc., CCH Fed. Sec.L.Rep. ¶ 92,324 at 97,534 (M.D. Ala.1968); Miller v. Hano, 8 F.R.D. 67, 71 (E.D.Pa.1947). It is clear that a person who is deemed to be a controlling person under Section 15 may be considered to have participated in an offer or sale. Whittaker v. Wall, 226 F.2d 868, 871–872 (8th Cir. 1955); Lester v. Preco Industries, Inc., 282 F.Supp. 459, 460–461 (S.D.N.Y.1965); Miller v. Hano, *supra*; 3 Loss, Securities Regulation 2008 (2d ed. 1961).

The Complaint alleges that the individual defendants, including McDonald, were in sole control of the Association and acted together to consummate the 1968 Reorganization and that each is therefore a controlling person of the Association within the meaning of Section 15. Defendant's affidavit does not rebut the allegations of control. *Compare*: Larson v. Tony's Investments, Inc., *supra*. For the purposes of the present motion to dismiss, venue as to this defendant must be held proper. Klapmeier v. Telecheck International, Inc., *supra*; Larson v. Tony's Investments, Inc., *supra*; Lester v. Preco Industries, Inc., *supra*.

**B.** *Personal Jurisdiction Under Counts V and VI.*

Counts V and VI of the Complaint assert claims under the Maine Blue Sky Law upon principles of pendent jurisdiction. Hurn v. Oursler, 289 U.S. 238, 53 S.Ct. 586, 77 L.Ed. 1148 (1933). As previously noted, service in this action was made upon McDonald personally at his Florida residence by a United States Marshal. McDonald takes the position that this Court does not have personal jurisdiction over him with regard to these pendent state law claims because he was not served with process within the State of Maine. His argument is that the extra-territorial service upon him can only be based upon Section 22(a) of the Securities Act [46] or Section 27 of the Exchange Act,[47] which he contends does not authorize service outside the District upon non-resident defendants with respect to pendent state claims.

It is not necessary in this case to reach the as yet unresolved question of whether personal jurisdiction over a non-resident defendant for purposes of pendent state law claims may be sustained on the basis of a jurisdictional grant contained in the statute which is the basis of the federal claim.[48] Whether or not the service upon this de-

---

agreement or understanding with one or more other persons by or through stock ownership, agency, or otherwise, controls any person liable under sections 77k or 77l of this title, shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist.

Rule 405(f) promulgated by the Securities and Exchange Commission under the Act, 17 C.F.R. § 230.405(f), defines "control" as follows:

(f) *Control.* The term "control" (including the terms "controlling", "controlled by" and "under common control with") means the possession, direct or indirect, of the power to direct or cause the direction of the management and

policies of a person, whether through the ownership of voting securities, by contract, or otherwise.

46. Page 915, *supra*. Fed.R.Civ.P. 4(f), of course, permits extra-territorial service when authorized by a federal statute.

47. Section 27 of the Exchange Act, 15 U.S.C. § 78aa, differs from Section 22(a) of the Securities Act only in that it provides venue in any district where any act or transaction constituting the violation occurs, rather than the place of offer or sale, and there is no requirement that defendant must have participated therein.

48. The lower federal courts and the commentators have divided on this question. *Compare* Cooper v. North Jersey Trust Co., 226 F.Supp. 972, 980 (S.D.N.Y. 1964); Puma v. Marriott, 294 F.Supp. 1116, 1121 (D.Del.1969); Townsend Corp. v. Davidson, 222 F.Supp. 1, 4 (D. N.J.1963); 4 Wright & Miller, Federal

fendant can be sustained under Sections 22(a) or 27, the service was proper under Fed.R.Civ.P. 4(d) (7) and the Maine long-arm statute, 14 M.R.S.A. § 704. Under Rule 4(d) (7) service may be made ". . . in the manner prescribed by the law of the state in which the district court is held for the service of summons or other like process upon any such defendant in an action brought in the courts of general jurisdiction of that state." *See also* Fed.R.Civ.P. 4(e). The Maine long-arm statute provides for personal jurisdiction of the Maine courts over a non-resident "as to any cause of action arising from . . . the transaction of any business within this State." 14 M.R.S.A. § 704(1) (A). The statute further validates extra-territorial service of process upon any such person. 14 M.R.S.A. § 704(2). The causes of action asserted against McDonald in Counts V and VI of the Complaint unquestionably arose from the transaction of business by him in Maine. *See* 1 Field, McKusick and Wroth, Maine Civil Practice § 4.10 at 93 (2d ed. 1970). *Cf.* Foye v. Consolidated Baling Machine Co., 229 A.2d 196 (Me.1967); Forbes v. Wells Beach Casino, Inc., 219 A.2d 542 (Me. 1966). And it is clear that pursuant to Fed.R.Civ.P. 4(d) (7) and 4(e) service upon a non-resident defendant may be made under a state long-arm statute without resort to a federal statute authorizing such service. 4 Wright & Miller, Federal Practice and Procedure: Civil § 1068 at 249, § 1112 at 461, § 1125 at 528–29 (1969); 2 J. Moore, Federal

Practice ¶ 4.41–[1] at 1291.9 (2d ed. 1966).

Defendant McDonald's separate motion to dismiss Counts I, II, V and VI of the Complaint is denied.

V

## CONCLUSION

In accordance with the foregoing, it is ordered as follows:

1. Defendants' motions for summary judgment are denied.

2. Defendants' motions to dismiss Count I of the Complaint, so much of Count II as asserts a claim under Section 17(a) of the Securities Act, Count IV, Count VII, Count VIII and Count X of the Complaint are granted.

3. Defendants' motions to dismiss so much of Count II of the Complaint as asserts a claim under Section 12(2) of the Securities Act, Count III, Count V, Count VI and Count IX of the Complaint are denied.

4. Defendant McDonald's separate motion to dismiss Counts I, II, V and VI of the Complaint is denied.

## CERTIFICATE

Pursuant to 28 U.S.C. § 1292(b) I hereby certify that in my opinion the foregoing order involves controlling questions of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation.

Practice and Procedure: Civil § 1125 at 527–29 (1969); 5 Loss, Securities Regulation 2974 (2d ed. 1961) (such service authorized) *with* Wilensky v. Standard Beryllium Corp., 228 F.Supp. 703, 705 (D.Mass.1964); Trussell v. United Underwriters, Ltd., 236 F.Supp. 801, 804–805 (D.Colo.1964); International Ladies' Garment Workers' Union v. Shields &

Co., 209 F.Supp. 145, 147–148 (S.D. N.Y.1962); Ferguson, Pendent Personal Jurisdiction in the Federal Courts, 11 Vill.L.Rev. 56, 74 (1965) (such service not authorized). Neither the Supreme Court nor the First Circuit has ruled on the question. *But see* Moreno v. United States, 120 F.2d 128 (1st Cir. 1941).